**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| GEORGE-FIKES, LLC and | ) | |
| KENNETH FIKES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. _____ |
| | ) | JURY DEMANDED |
| | ) | |
| | ) | |
| THE CITY OF KNOXVILLE, | ) | |
| TENNESSEE, CITY OF KNOXVILLE | ) | |
| HOUSING AND NEIGHBORHOOD | ) | |
| DEVELOPMENT DEPARTMENT, | ) | |
| STEPHANIE WELCH, and | ) | |
| BECKY WADE, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Comes George-Fikes, LLC and Kenneth Fikes (collectively "Plaintiffs"), by and through

counsel, and for cause of action against Defendants, would show as follows:

## PARTIES

1.      Plaintiff George-Fikes, LLC ("George-Fikes" or "the Company") is a Tennessee

limited liability company with its principal place of business at 2104 East Magnolia Avenue, Suite

B, Knoxville, Tennessee 37917.

2.      Plaintiff Kenneth Fikes ("Mr. Fikes") is a Tennessee resident who is the President

of George-Fikes. Mr. Fikes is an African-American male.

3.      Defendant the City of Knoxville, Tennessee (the "City") is a municipal corporation

located in Knox County, Tennessee, and is a political subdivision of the State of Tennessee. The

City is organized under the laws of the State of Tennessee and is located in this District.

4.      Defendant the City of Knoxville Housing and Neighborhood Development Department is a department of the City (formerly known as the Community Development Department), which is responsible for overseeing the administration and development of the City's Homemaker's Program and Affordable Rental Development Program.[1] Upon information and belief, the Housing and Neighborhood Development Department receives federal funding through the U.S. Department of Housing and Urban Development (HUD) Community Planning and Development Programs, as well as the HOME Investment Partnerships Program.

5.      Stephanie Welch ("Ms. Welch"), in her official capacity, is the City's Chief Economic & Community Development Officer and Deputy to the Mayor. In this role, she oversaw the actions of employees in the City's Housing and Neighborhood Development Department, including Janna Cecil ("Ms. Cecil").

6.      Becky Wade ("Ms. Wade"), in her official capacity, is the Director of the City's Housing and Neighborhood Development Department. In this role, she oversaw the actions of Ms. Cecil, as well as the review of Plaintiffs' applications to Homemaker's Program and Affordable Rental Development Program.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction under 28 U.S.C. § 1331, 42 U.S.C. §§ 3613(a)(1)(A) and 3613(c), and 28 U.S.C. § 1343. This action is being brought by Plaintiffs in part to enforce the provisions of Title VIII of the Civil Rights Act of 1968 (the "Fair Housing Act"), as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq*., as well as Title

---

[1] As the Housing and Neighborhood Development Department was previously named the Community Development Department during most of the relevant time period, they will be used interchangeably throughout the Complaint.

2

VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. ("Title VI") and 42 U.S.C. § 1981 ("Section 1981").

8.    This Court has supplemental jurisdiction over Plaintiffs' state-law causes of action pursuant to 28 U.S.C. § 1367(a), as claims so related to other claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

9.    Venue is properly fixed in this Division and District pursuant to, *inter alia*, 28 U.S.C. § 1391(b), because the City is located within this Division and at least a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this Division.

10.    Plaintiffs have standing to bring a claim pursuant to the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, under 42 U.S.C. § 3613(a)(1) and the holding of the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977).

## FACTUAL BACKGROUND

11.    Mr. Fikes is an experienced businessman in the financial and trucking industries. After attending the University of Pennsylvania, he has worked as an equity options trader on the Philadelphia Stock Exchange and the Chief Operating Officer for the Oklahoma Supreme Court, in addition to being an analyst and portfolio manager. He then founded George-Fikes before moving to Knoxville, Tennessee in 2013.

12.    George-Fikes is an experienced management company which has successfully managed commercial, industrial, and residential projects. In particular, Mr. Fikes and George-Fikes previously developed a 10-unit, 5 duplex market-rate complex in Oklahoma City, Oklahoma. Mr. Fikes has managed constructions projects covering millions of dollars, both privately and for the United States Government.

3

13.     Under the City's Housing and Neighborhood Development Department, the Homemaker's Program is dedicated to repurposing properties (vacant lots and lots with substandard structures) by selling these lots to non-profit organizations, for-profit business, and private developers. The City's goals in selling these properties are the necessity of blight removal, neighborhood redevelopment, and/or affordable housing opportunities.

14.     Individuals and developers who buy property through the Homemaker's Program are required to either construct a new dwelling on the property or rehabilitate the structure that already exists, ensuring that it will not be abandoned again.

15.     An individual or developer is required to submit a Homemaker's Program application to purchase property with the Community Development Department, and applications are then reviewed by the Homemaker's Program Committee. Once an application is approved, the purchaser will enter into a conditional sales agreement to specify the terms of the purchase and conditions for transfer.

16.     The City also requires approval from the Infill Housing Committee. Upon final approval of the plans, title for the property will be transferred to the approved purchaser. However, final approval of the purchase lies with the City Council.

17.     The City has also created an Affordable Rental Development Program to incentivize the development of quality affordable rental housing. Applicants for the Affordable Rental Development Program may receive funds for either new construction or retrofitting of existing buildings. However, all funded units must be leased to low-income tenants.

18.     The maximum award under the Affordable Rental Development Program is $30,000 per unit. Financing is provided through a deferred payment loan, which does not require a monthly payment and forgives over the length of the loan.

4

19.     Construction plans and designs under the Affordable Rental Development Program must be provided to the City's Community Development Department for review and approval. The Community Development Department staff will recommend project approval and funding amounts to the City Council, who will then provide final approval.

20.     The City's Rental Rehabilitation Program ("RRP"), overseen by City's Community Development Department, provides owners of residential rental property with financial and technical assistance in return for participants agreeing to rent and occupancy restrictions which provide for the availability of affordable housing.

21.     The RRP also utilizes deferred payment loans, and total funding is limited to a maximum amount of $30,000 per unit. Under the RRP, property owners must be able to obtain financing for all rehabilitation costs in excess of the City's contribution, and the property must have a positive cash flow.  The RPP provides that funding for eligible projects is on a first-come, first-serve basis, but if demand exceeded available funds, then funding would be determined on listed selection criteria, including property: 1) located in a current Community Development targeted area, including East Knoxville; 2) which was currently uninhabitable due to no fault of the current owner; and 3) property that was purchased through the City's Homemaker Program.

22.     In 2019, Mr. Fikes and George-Fikes sought to develop property in Knoxville due, in part, to the affordable housing crisis in Knoxville and a desire for African American developers to assist in the City's development.

23.     Approximately 16.9% of the population of the City is African American under the 2020 census. In total, African Americans continue to experience the highest level of poverty, as the Knoxville-Knox County Community Action Committee has estimated that in 2020, 41.3% of African Americans live below the poverty level compared to 22.1% of Caucasians.

24.     The Knoxville Community Development Corporation operates approximately twenty-three affordable, low-income housing communities, and nearly all of these developments have a waiting list.

25.     Affordable housing has been listed as a top priority for Mayor Indya Kincannon's administration, with the 2020-2021 budget appropriating $7.5 million to support affordable housing in the City, including a continued investment of $2.5 million in the Affordable Rental Development Fund to support the creation of affordable housing.

26.     The City, through the City Council, has approved numerous funding proposals for building affordable housing during the time period at issue, including providing funding from the Affordable Rental Development Fund.

27.     In part due to the drastic need for affordable housing in the City detailed above, Mr. Fikes and George-Fikes sought to purchase property through the City's Homemaker's Program and construct affordable housing with assistance from funding programs in place by the City.

28.     On or about July 16, 2019, Mr. Fikes and George-Fikes submitted applications to the City's Homemaker Program to purchase four lots located at 2901, 2907, 2909 and 2735 Martin Luther King Jr. Avenue (referred to as the "2901, 2907, 2909 and 2735 lots" or "the Development"). The original plan for the applications was to build three new residential duplexes that would be offered for rent as affordable housing, along with an office for the company being built on the 2735 lot.[2]

29.     Keisha Rivers ("Ms. Rivers") is the Director of Operations of George-Fikes and assisted with the development and administration of the Development. Ms. Rivers is also a graduate from the University of Pennsylvania, with an M.Ed. from the University of New Orleans.

---

[2] These plans were later amended to build two additional duplexes on the 2735 lot due to zoning issues.

She has over two decades of experience in organizational operations, strategic planning, and leadership development.

30.     As a part of these applications, George-Fikes submitted information regarding Mr. Fikes' and the Company's qualifications as a developer, a copy of their state contractor's license, copies of plans for the buildings to be constructed, and a summary of the development team's background and experience for review and approval by the Homemaker's Program Review Committee.

31.     The Homemaker's Program Review Committee was made up of members of the City's Department of Community Development, Zoning & Planning, and Engineering Departments. Ms. Cecil, the Housing Manager for the City's Department of Community Development, was a member of the Homemaker's Program Review Committee.

32.     On or about July 31, 2019, Plaintiffs' Homemaker's Program applications for the 2901, 2907, 2909 and 2735 lots were approved by the Homemaker's Program Review Committee.

33.     On or about September 5, 2019, the proposed plans for the duplex and office project for the 2901, 2907, 2909 and 2735 lots were approved by the Infill Housing Committee. Ms. Cecil served as the Chair of the Infill Housing Committee.

34.     On or about September 24, 2019, the City approved the sale of the lots to George-Fikes. The application from the Homemaker's Program was approved without any funding conditions.

35.     Plaintiffs were not informed of any funding available for the Development from the RRP or the Affordable Rental Development Program. After doing their own research and discovering the City's funding programs, Plaintiffs contacted Ms. Cecil to discuss the applicability and requirements for potential City funding programs in support of the Development.

36.     Plaintiffs conferred with Ms. Cecil regarding the appropriate affordable housing funding program in place by the City, and submitted applications for RRP funding for the 2901, 2907, and 2909 lots on October 29, 2019. Ms. Cecil indicated that she was recommending approval of Plaintiffs' application for funding on this date.

37.     On or about November 6, 2019, Ms. Cecil requested that Plaintiffs complete an Affordable Rental Development Funding Request, instead of the RRP, as there was another project that had withdrawn from consideration, and she would submit Plaintiffs' project in its place for the Affordable Rental Development Program.

38.     Plaintiffs then submitted the Affordable Rental Development Program application on or about November 7, 2019.

39.     Plaintiffs spoke with Ms. Cecil on or about November 12, 2019 regarding the application requirements and reviewed the maximum amount that could be charged for rent, vacancy rate standard (including letters of support from Knoxville Community Development Corporation to provide low-income tenants from their waiting list), the amount of property taxes for the Development, the need for a replacement reserve and management fees and an approved debt coverage ratio of 1.15.

40.     After further discussion, Ms. Cecil did not indicate any issues with Plaintiffs' plan to manage the property themselves, the source of Plaintiffs' funding, or the estimated debt coverage ratio of 1.15.

41.     At this time, Plaintiffs were seeking outside funding to cover the remainder of the Development's costs not covered by the City's contribution through the Affordable Rental Development Program.

8

42.     Plaintiffs informed Ms. Cecil that a preapproval commitment letter was needed to present to their lenders showing the City's commitment to provide funding of $30,000 per door for the Development. Ms. Cecil informed Plaintiffs that she planned to present the application for approval by the City Council on December 17, 2019.

43.     On or about November 22, 2019, Plaintiffs spoke with Todd Kennedy, the Community Development Department's Construction Management Supervisor, who informed them that he had reviewed the construction budget for cost reasonableness, that the City had all of the information that it needed, and that "based on what he's seen already we're fine and good to go," but that he needed to meet with Ms. Cecil.

44.     On November 25, 2019, Ms. Cecil wrote Mr. Fikes a letter regarding the 2901, 2907, and 2909 lots, stating that the City was "fully in support of this project" and "expect[ed] to take the full amount [$180,000] to City Council for approval," pending compliance with "[a]pproval of a first mortgage with a debt coverage ratio no lower than 1.15" and "[c]onfirmation of additional capital contribution to cover the remaining gap."

45.     In November of 2019, Plaintiffs were told that the City Planning Department could not support rezoning the 2735 lot for office use, but it would support and fast-track an application to change the lot to residential zoning. Plaintiffs subsequently altered their plans to place two duplexes on the 2735 lot. Therefore, under the new plans for the Development, Plaintiffs sought to build a total of five duplexes on the 2901, 2907, 2909 and 2735 lots.

46.     Under the Affordable Rental Development Program, Plaintiffs were seeking $300,000 in funding from the City's Community Development Department, while Plaintiffs had obtained private funding for the remaining approximately $830,000 to complete the Development.

9

47. On November 25, 2019, Ms. Cecil indicated to Plaintiffs that she was working on an approval or support letter that Plaintiffs could provide to their lenders. Plaintiffs also provided Ms. Cecil with a commitment letter from an initial lender to show funding intent as required under the Affordable Rental Development Program.

48. Ms. Cecil had not raised any concerns about Plaintiffs' applications up until this point, but began requesting that Plaintiffs update their application regarding the amount of property taxes, debt service for the Development, and building costs. Specifically, Ms. Cecil requested that Plaintiffs also update their application to add a maintenance budget and a contingency reserve.

49. On or about December 20, 2019, Plaintiffs spoke with Ms. Cecil regarding the status of their application, and Ms. Cecil raised concerns for the first time that the project "was not cash flowing."

50. A meeting was held on or about December 23, 2019, with Ms. Cecil and Ms. Wade, regarding newly-identified issues in Plaintiffs' application, including a management fee, a replacement reserve, and updated property tax numbers. The parties agreed that Plaintiffs would manage the properties themselves, so no property fee was required; a replacement reserve was submitted in the pro forma submitted to the City; and that Plaintiffs would update their application to reflect higher property tax numbers provided by Ms. Cecil. At the conclusion of this meeting, Ms. Cecil and Ms. Wade indicated that they were very excited about Plaintiffs' project, and that Plaintiffs would submit a new pro forma to update the application and provide proof of funds for the capital contribution.

51. After this meeting, Plaintiffs believed that all of the issues raised by Ms. Cecil had been satisfactorily addressed, and that both Plaintiffs and Ms. Cecil were ready to move forward in the next steps in the process.

10

52. Ms. Cecil provided a second approval letter pledging the City's funding for $300,000 after this meeting and Plaintiffs updated their revised application for funding to include two additional duplexes at the 2735 lot. This January 28, 2020 letter stated that the City was "fully in support of this project" for the 2901, 2907, 2909, and 2735 lots and "expect[ed] to take the full amount [$300,000] to City Council for approval," pending compliance with "[a]pproval of a first mortgage with a debt coverage ratio no lower than 1.15" and "[c]onfirmation of additional capital contribution to cover the remaining gap."

53. Plaintiffs had numerous conversations with Ms. Cecil in January and February 2020 regarding the final approval for funding. Plaintiffs provided Ms. Cecil with lender team sheets from Global Integrity and Tidal Loans that were contingently approved, as final approval was based upon Plaintiffs receiving construction permits and funding from the City.

54. On or about February 17, 2020, Ms. Cecil informed Plaintiffs that there were issues with the Development "not cash flowing," and that Plaintiffs' calculations did not work with "her spreadsheet." Plaintiffs questioned where these issues had come from, as Plaintiffs had complied with the requirements outlined in the December 23, 2019 meeting, had obtained another approval letter from the City, and had provided her with private financing approval letters.

55. Mr. Fikes offered to walk Ms. Cecil through the calculations he utilized regarding the application, funding sources, and debt to credit ratio. However, Ms. Cecil was not receptive to additional communication on these issues and did not further discuss these issues with Mr. Fikes.

56. As the City required the Development to be 100% affordable housing, the five duplexes in the Development would have a lower debt coverage ratio because the amount of rent was capped at affordable housing rates. On a construction of larger affordable housing units, the City only requires a certain percentage of units to be rented an affordable housing rate, leaving the

remaining units to be rented at a market rate, resulting in a higher debt coverage ratio. However, Ms. Cecil and the City were aware of Plaintiffs' plans for the Development from the outset of their applications and had approved the 1.15 debt coverage ratio in two previous approval letters.

57. Further, Ms. Cecil and the City had not previously indicated that a reserve fund would be required or raised continued objections to Plaintiffs not utilizing a management company—additional requirements they raised at this time.

58. At this point, approximately seven months into the Development, Ms. Cecil identified the issue as Mr. Fikes not being "qualified" for the funding, raised concerns about Mr. Fikes' qualifications or experience to manage the Development, and told Plaintiffs that she "did not know" Mr. Fikes or his lenders—despite Plaintiffs receiving two approvals as part of the Homemaker's Program, Ms. Cecil providing two approval letters from the City for Plaintiffs' lenders, and continually maintaining that the City's Community Development Department was excited for and in favor of the Development.

59. On or about February 19, 2020, Plaintiffs received an email from Ms. Cecil stating that she had called Plaintiffs' lender who said that they were not "fully committed" and "have some concerns about the sustainability of the Project."

60. Plaintiffs subsequently learned that rather than simply calling their lenders and verifying the terms of the funding, as would be standard protocol, Ms. Cecil contacted the lender and asked specific information regarding their past experience with George-Fikes, the nature of the financing, and what information Plaintiffs had provided to the lender in order to gain approval. In particular, Ms. Cecil went to considerable lengths to cast doubt on Mr. Fikes' character, experience, and the sustainability of the Development.

12

61.     During this period, Plaintiffs also experienced an unprecedented number of delays, and requests for resubmissions, and were subject to additional permitting review fees, despite the fact that the City's Community Development Department was supposed to work in connection with the Planning and Permitting offices to assist applicants for the Homemaker's Program and Affordable Rental Development Program.

62.     Plaintiffs' original permitting requests for the Development underwent several rounds of review and corrections required by the City—atypical for projects of similar scope and size and incurring additional permitting fees. For example, the City required individualized drawings and specific notes on plan details covered by the original permitting plans and drawings.

63.     Plaintiffs attempted to comply with the directive of the City to provide notes on submitted drawings in response to comments, but the permits were rejected. Plaintiffs were required to undergo several rounds of revisions in the unnecessarily complex permitting process, in addition to an uncommon bond requirement for the Development.

64.     In total, Plaintiffs spent substantial amounts for the surveying of the 2901, 2907, 2909 and 2735 lots, building permit and inspection fees to the Community Development Department, purchase and recording fees for the Development, in addition to their time continually revising the Development's plans to meet requirements put in place by the City. These increased requirements would not normally have been required by the City with regard to a project of this scale.

65.     The amount of scrutiny and revisions required for the plans for the Development are atypical for a project of this size—the development of five duplexes. Additionally, the City required continued revisions to the construction plans drawn up by Plaintiffs' retained architect that far exceeded what would standardly be expected for duplexes of this scale.

66. On or about March 11, 2020, Plaintiffs met with Ms. Wade, Ms. Welch, and Vice Mayor Gwen McKenzie to attempt to resolve the issues with Ms. Cecil and their updated Affordable Rental Development Program application. During this meeting, Ms. Wade told Plaintiffs that they needed to reapply for funding from the Affordable Rental Development Program, despite Plaintiffs previously receiving two approval letters from Ms. Cecil. Ms. Wade and Ms. Welch also reiterated Ms. Cecil's new-found concerns regarding the source of funding, operating expenses allegedly being below industry standard, Plaintiffs being forced to hire a property management company, and an allegedly unacceptable debt to credit ratio.

67. Ms. Welch, Ms. Wade, and Ms. Cecil are all Caucasian females.

68. Believing that Defendants' actions were attempting to delay the Development's timeline until a decision was no longer relevant, Plaintiffs requested an extension of the timeline they encountered as a result of Ms. Cecil's actions. However, the requested extension was denied.

69. In August 2020, Plaintiffs sent a letter to the City Community Development Department setting forth the timeline of the actions of Ms. Cecil and Ms. Wade in delaying their application and approval for funding, despite previously receiving two approval letters for funding from the City.

70. On or about September 9, 2020, Ms. Rivers spoke with Tatia Harris ("Ms. Harris"), the Diversity and Inclusion Officer of the City's Office of Community Empowerment. They discussed the filing of an official complaint pursuant to Title VI of the 1964 Civil Rights Act, and Ms. Harris reported that the City should have initially told Plaintiffs about the funding available for the Development after their Homemaker's Program application was approved—particularly in light of the fact that Ms. Cecil was on the original committee. Ms. Harris told Plaintiffs that she

14

would be recommending extending the timeline for the Development to be completed to October 2022, and the City honoring its commitment of $300,000 for the Development.

71.     After further discussions with Plaintiffs and Ms. Rivers, Ms. Harris reported that she believed that Ms. Cecil had "messed up" with the review of Plaintiffs' applications. On or about November 13, 2020, Ms. Harris reported to Ms. Rivers that she had met with Charles Lomax, the City's Director of Community Empowerment, and had presented the recommendations from her investigation. These recommendations included a twenty-four-month extension of the Development, the $300,000 from the City still being earmarked for the Development, diversity and inclusion training, a review and update of current practices, and for George-Fikes to be given the option to change the Development to charging a market rate.

72.     After not receiving any updates, Ms. Rivers spoke with Ms. Harris on or about January 29, 2021, and was told that Ms. Harris had met with the City Law Department and the next step would be a review by the Tennessee Human Rights Commission. However, Ms. Harris told Ms. Rivers to expect favorable results.

73.     Plaintiffs subsequently retained counsel in an attempt to obtain a tolling agreement. A tolling agreement was signed on March 9, 2021 but expired on June 7, 2021. Plaintiffs did not receive any further updates on the Title VI complaint.

74.     Plaintiffs did not receive a copy of the Title VI report completed by Ms. Harris, which Plaintiffs learned in May 2022 concluded that there was no evidence of racial discrimination against Mr. Fikes and several independent reasons for the Development's rejection. None of the recommendations that Ms. Harris had previously told Plaintiffs were included in the report.

75.     Moreover, Plaintiffs did not receive any updates regarding the status of their applications for the Development with the Homemaker's Program and Affordable Rental

Development Program until January 6, 2022 when Ms. Wade offered a full refund and reimbursement of $7,291.05 in exchange for a release of all of Plaintiffs' claims against the city relating to the City's Homemaker Program and Affordable Rental Development Program. In particular, Ms. Wade offered to:

- Refund the $350 deposit for 2735 MLK Avenue;

- Refund the $2,500 purchase price for 2901 MLK Avenue;

- Reimburse the $58 recording fee and $9.25 transfer tax for 2901 MLK Avenue;

- Refund the $2,000 purchase price for 2907 MLK Avenue;

- Reimburse the $53 recording fee and $7.50 transfer tax for 2907 MLK Avenue;

- Refund the $200 purchase price for 2909 MLK Avenue;

- Reimburse the $58 recording fee and $7.40 transfer tax for 2909 MLK Avenue;

- Reimburse the $200 plat review and $48 addressing fees; and

- Release you and George, Fikes, LLC from the terms and conditions of the corresponding Homemaker Agreements.[3]

76.    Plaintiffs viewed this offer of release as the ultimate denial of their Homemaker's Program and Affordable Rental Development Program applications.

77.    Plaintiffs later learned that in a February 28, 2022 letter, the City stated that it would record reversionary quitclaim deeds for the 2901, 2907, and 2909 lots, as well as cancel the Homemaker Agreement for the 2735 lot. However, Plaintiffs submit that they never received this letter.

---

[3] A deposit was paid to hold the 2735 lot.

16

78. Ultimately, Defendants' actions had the effect of unlawfully denying funding from the Homemaker's Program and Affordable Rental Development Program by continually imposing requirements on Plaintiffs that were not necessary or regularly imposed for similar projects.

79. This delay and refusal to present Plaintiffs' applications to the City Council for approval constituted a denial of their application under the Affordable Rental Development Program and Homemaker's Program, as Ms. Cecil and the Community Development Department possessed the unilateral authority to recommend approval for a vote by the City Council.

80. As a result of the unlawful denial of funding from the City, Plaintiffs have been unable to commence construction of the Development.

81. This delay in construction and the receipt of funding is the result of illegal and discriminatorily motivated actions of Defendants.

82. Through the actions described above, Defendants have acted negligently, intentionally, maliciously, and with willful, malicious, wanton, and reckless disregard for federal and state fair housing laws.

83. On information and belief, the actions of Ms. Cecil and the Community Development Department were based, at least in part, on Mr. Fikes' race

84. Moreover, by, in essence, denying Plaintiffs' application for funding, Defendants have made dwellings unavailable to persons because of race, color, familial status, or national origin in violation of 42 U.S.C. § 3604(a). Those persons will statistically be disproportionately affected, in violation of the Fair Housing Act and other laws.

85. Plaintiffs' damages include, but are not limited to, lost monetary investment, lost profits, lost time, and attorney's fees.

86.     Based on the City's representations that their applications would be approved, Plaintiffs invested over $70,000 in the acquisition of the property, and in the engineering, design, planning, financing, and approvals necessary for the development of the Development in accordance with the plans as presented to the City's Community Development Department. Plaintiffs would not have pursued this Development, including the several additional rounds of revised designed plans, permits, and zoning fees, had they not received multiple indications by the City that the Development would be approved.

## COUNT I – INTENTIONAL RACE DISCRIMINATION

87.     Plaintiffs adopt and incorporate the preceding paragraphs of this Complaint as if set forth fully herein.

88.     This claim is brought pursuant to Title VI, which provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

89.     This action is also brought pursuant to 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

90.     The Housing and Neighborhood Development Department, which provides funding for the Homemaker's Program and Affordable Rental Development Program, receives federal financial assistance.

18

91.     Defendants discriminated against Plaintiffs on the basis of race, color, and/or ethnicity, in violation of Title VI and Section 1981, by intentionally discriminating against Mr. Fikes on the account that George-Fikes is a minority-owned business and that Mr. Fikes and Ms. Rivers are African-American.

92.     At all pertinent times, Plaintiffs were members of a protected class for the purposes of Title VI and Section 1981.

93.     Defendants had the specific intent to discriminate against Plaintiffs because of their race and/or status as a minority-contractor.

94.     Defendants' intentional discrimination was intended to and did interfere with Plaintiffs' rights to make and enforce contracts.

95.     Specifically, Defendants intentionally discriminated against Plaintiffs by refusing to present their applications for the Development with the Homemaker's Program and Affordable Rental Development Program to the City Council for approval, as well as raising concerns about Mr. Fikes not being "qualified" several months into the process; casting doubts on Mr. Fikes' character, experience, and the sustainability of the Development; and imposing extreme and atypical requirements that were not imposed for similar projects.

96.     There were no legitimate, nondiscriminatory reasons for the differences in treatment and requirements imposed on Plaintiffs.

97.     Defendants engaged in an intentional pattern and practice of behavior designed to harm Plaintiffs because of Mr. Fikes' status as a minority contractor.

98.     As a direct, foreseeable, and proximate result of said wrongful acts by Defendants, Plaintiffs suffered and continued to suffer damages that include, but are not limited to, harm to

their name and reputation, the loss of good will, lost pay and profits, extra costs and fees incurred, attorney's fees, mental pain and anguish, and other compensatory damages.

99.     The conduct of Defendants and their agents and employees as described herein was malicious and done in conscious disregard of Plaintiffs' rights, as well as done by executive employees of Defendants, or was at least done with reckless indifference to the federally protected rights of Plaintiffs. Plaintiffs are thereby entitled to an award of punitive damages against Defendants.

## COUNT II – DEFENDANTS' ACTIONS CONSTITUE A VIOLATION OF THE FAIR HOUSING ACT

100.     Plaintiffs adopt and incorporate the preceding paragraphs of this Complaint as if set forth fully herein.

101.     Defendants denied financial assistance for the Development and affordable housing rental development because of the race, color, and/or ethnicity of Mr. Fikes and George-Fikes' status as a minority contractor. Defendants' treatment of Plaintiffs during the Development and rejection of their applications to the City's Homemaker's Program and the Affordable Rental Development Program are the result of a discriminatory purpose, including:

    a.  A denial or making unavailable of housing because of race, in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a);

    b.  Discrimination in the terms, conditions, or privileges of building dwellings, or in the provision of services or facilities in connection therewith, because of race, in violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b);

    c.  Discrimination in the making of providing financial assistance in violation of 42 U.S.C. § 3605(a).

102. Mr. Fikes, and therefore George-Fikes, is a member of a protected class as an African-American developer;

103. Plaintiffs applied for and were qualified to develop property pursuant to the City's Homemaker's Program and Affordable Rental Development Program;

104. The City and Defendants engaged in a "residential real estate-related transaction" when it engaged reviewed Plaintiffs' applications for affordable housing funding programs.

105. Defendants blocked and impeded Mr. Fikes and George-Fikes' efforts to provide affordable housing to low-income families in the City. Racial minorities, especially African Americans, make up a disproportionate percentage of lower-income households that rely on lower-income housing.

106. As detailed above, Defendants departed from their normal procedure and treated Plaintiffs less favorably based upon Mr. Fikes' status as a minority contractor.

107. Defendants' discriminatory intent was the motivation behind their efforts to stall George-Fikes' applications for the City's Homemaker's Program and the Affordable Rental Development Program, and to impose additional requirements at the last minute after previously indicating their approval for the Development, constituted placing unfair and unnecessary restrictions on Plaintiffs' applications to develop the Development.

108. Ultimately, Defendants refused to recommend Plaintiffs' applications for approval by the City because of a racially-motivated desire which is reflected by the process of their consideration of Plaintiffs' applications to the City's Homemaker's Program and the Affordable Rental Development Program.

109.     Further, the actions of the City also actually and predictably resulted in a disparate impact, namely the denial of housing opportunities for low-income African-American families at the Development.

110.     Plaintiffs suffered economic damages as a result of Defendants' discriminatory treatment, in addition to emotional distress and humiliation as a result of Defendants' efforts to stall and/or prevent the Development.

## COUNT III – PROMISSORY ESTOPPEL

111.     Plaintiffs adopt and incorporate the preceding paragraphs of this Complaint as if set forth fully herein.

112.     As alleged herein, Plaintiffs submitted applications to Defendants for the Development through the City's Homemaker's Program and the Affordable Rental Development Program.

113.     Defendants approved Plaintiffs' applications on several occasions and indicated their commitment and enthusiasm to submitting Plaintiffs' applications for the Development to the City Council for approval.

114.     Defendants should have reasonably expected these promises to induce action or forbearance on the part of the Plaintiffs. Specifically, Defendants should have reasonably expected Plaintiffs to continue to spend significant amounts of money and time on the development of the Development and to meet the conditions repeatedly imposed for the Development.

115.     Plaintiffs relied on these promises to their detriment, as Plaintiffs continued to spend significant time and funds on the Development despite Defendants' discriminatory intent and decision not to submit the applications to the City Council for approval.

116. Plaintiffs' reliance on the representations of Defendants' promises was justifiable and reasonable in light of the continued representations that their applications would be approved and revisions to the applications to meet the requirements imposed by Defendants.

117. The detriments Plaintiffs suffered are substantial in an economic sense.

118. The substantial loss to the Plaintiffs acting in reliance on Defendants' promises was foreseeable by Defendants, who could foresee that Plaintiffs would spend substantial time and resources to meet the excessive and unreasonable additional requirements for the Development.

119. Injustice can be avoided only by the enforcement of the promises made by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A. An entry of judgment in Plaintiffs favor on all counts, including a finding that the foregoing actions of Defendants violated Title VI, the Fair Housing Act, and Section 1981;

B. An award of compensatory damages in amount to be determined by the jury that would fully compensate Plaintiffs for the loss that has been caused by the conduct of Defendants alleged herein, including all damages suffered by Plaintiffs due to their detrimental reliance;

C. An award of punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

D. Enter an injunction directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein, including permitting Plaintiffs to develop the Development at the originally-agreed upon terms;

23

E. Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2), 42 U.S.C. § 1988, and any other applicable authority; and

F. Order any other such relief as this Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands a jury as to all claims so triable.

Respectfully submitted this 7th day of July 2022.

/s/ James T. Snodgrass
Beecher A. Bartlett, Jr. (BPR # 010198)
James T. Snodgrass (BPR # 036212)
Attorneys for Plaintiffs
Kramer Rayson LLP
P. O. Box 629
Knoxville, Tennessee 37901
865-525-5134
bbartlett@kramer-rayson.com
jsnograss@kramer-rayson.com
